IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICIA MANFRED, individually, and as )
Administratrix of the Estate of Joseph J. Gray, )
Deceased, )
                           )
         Plaintiff, )
                           )
     v. )         Civil Action No. 12-1508
                           )         Judge Nora Barry Fischer
NATIONAL RAILROAD PASSENGER )
CORPORATION and NORFOLK )
SOUTHERN RAILWAY COMPANY, )
                           )
         Defendants. )

## MEMORANDUM OPINION

Plaintiff Patricia Manfred brings this action individually and as Administratrix of the

Estate of Joseph J. Gray, her deceased son, alleging wrongful death and survival claims against

both remaining Defendants.[1] (Docket No. 1). On October 2, 2014, Defendants moved for

Summary Judgment, arguing no liability as to all counts. (Docket No. 39). Said Motion is now

fully briefed. (Docket Nos. 40, 41, 44, 45, 48, 49, 50, 55, 57). Upon consideration of the

parties' filings, their arguments presented at the January 9, 2015 Motion Hearing, (Docket No.

51), the Supplemental Briefs, (Docket Nos 55, 57), the last of which was filed on February 13,

2015, and for the reasons more fully stated herein, Defendants' Motion, (Docket No. 39), is

GRANTED.

## I. BACKGROUND[2]

---

[1] Defendant Norfolk Southern Corporation was dismissed, with prejudice, by stipulation on January 11, 2013. (Docket No. 22).
[2] The facts are viewed in the light most favorable to the Plaintiff, as this case comes before the Court on Defendants' Motion for Summary Judgment. *See, e.g., Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where no genuine issue of material fact exists, and where, viewing the facts in the light most favorable to the party against whom summary judgment was entered, the moving party is entitled to judgment as a matter of law.").

On October 21, 2010, Harry McIntosh, a certified locomotive engineer employed by National Railroad Passenger Corporation ("AMTRAK"), (Docket No. 40 at ¶ 3), operated a passenger train known as "The Pennsylvanian," on a route from Pittsburgh to New York City, (*Id.* at ¶ 4). At approximately 7:33 AM, the train came around a curve onto a straight line when, somewhere near mile post 346,[3] McIntosh observed something on the tracks. (*Id.* at ¶¶ 1, 6). According to McIntosh, it took him a second or two to determine that the "something" was a person. (*Id.* at ¶ 8). That person was Joseph Gray.[4] (*Id.* at ¶ 9). He was walking in the same direction that the train was traveling, with his back toward McIntosh. (*Id.*). Gray was walking within the gauge of the track[5] on which McIntosh's train was traveling. (*Id.* at ¶ 19).

At some point after identifying that Gray was walking within the gauge of the track, McIntosh sounded the train's horn. (*Id.* at ¶ 10). At no time did Gray attempt to leave the gauge of the track or respond in any manner to the train's horn. (*Id.* at ¶ 20; Docket No. 40-1 Ex. 4). McIntosh sounded the horn for 9.1 seconds. (Docket No. 40 at ¶ 30). Four to five seconds into the sounding of the horn, an "Engineer Initiated Emergency" of the brakes was made. (*Id.*). It took the train 24 seconds and 975 feet to come to a complete stop once the emergency brake was applied. (Docket No. 44 at ¶ 38). Unfortunately, the train did not stop in time, fatally striking Gray. (Docket No. 40 at ¶ 22; Docket No. 40-1 Ex. 4).

After coming to a complete stop, McIntosh exited the cab of the locomotive to assess the situation. (Docket No. 40 at ¶ 23). Gray was not on the front of the locomotive, but McIntosh

---

[3] This section of track is owned by Norfolk Southern Railway Company ("NSR"). (Docket No. 40 at ¶ 2).

[4] At the time of the incident, Gray was a 19 year old community college student. (Docket No. 56 at 12:18–20; Docket No. 40-1 at 10:23–24). There is no evidence of record suggesting Gray suffered from any physical or mental handicap.

[5] The gauge of the track is that portion between the rails, along which the train rides. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 518 (Frederick C. Mish et al. eds., 11th ed. 2007) (defining "gauge" as "the distance between the rails of a railroad").

did find earbud headphones hanging on the left side of the locomotive.[6]  (*Id.* at ¶¶ 23–24).

Additionally, a witness, Zoltan Weslowski, observed Gray walking in the middle of the train

tracks with his hood up.  (*Id.* at ¶ 25).  It appeared to Weslowski that Gray was wearing

headphones. (*Id.*).  Weslowski further confirmed the general narrative that the train approached

Gray from behind with its horn sounding continuously before striking him, and that Gray made

no attempt to move out of the way of the train.  (*Id.* at ¶ 26).

The relevant section of track was a class 3 track, meaning that the maximum allowable

operating speed for passenger trains is 60 miles per hour.  (*Id.* at ¶ 29 (citing 49 C.F.R. § 213.9)).

At no time did the train's speed exceed the maximum allowable speed for passenger trains on

this section of the track.  (*Id.* at ¶ 31).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).  Under Rule 56, a district court must enter summary judgment against a

party "who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  "Only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[A] party seeking summary judgment always

bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.

---

[6] An iPod™ was recovered from the scene and returned to Gray's mother.  (Docket No. 40 at ¶ 27).

When a non-moving party would have the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Id.* The moving party need not produce any evidence showing the absence of a genuine issue of material fact. *Id.* at 325. "Instead, . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* After the moving party has satisfied this low burden, the nonmoving party must provide facts showing that there is a genuine issue for trial to avoid summary judgment. *Id.* at 324. "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.*

In considering these evidentiary materials, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks and alterations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. To that end, the Third Circuit has noted that "depositions are 'one of the best forms of evidence for supporting or opposing a summary-judgment motion,' and that affidavits, not being subject to cross-examination, 'are likely to be scrutinized carefully by the court to evaluate their probative value.'" *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006) (quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722, at 373, 379 (3d ed. 1998)). Even inconsistencies within a Plaintiff's deposition may "cast[] doubt on the plaintiff's story" and "are matters ultimately useful in determining the plaintiff's credibility," but they "are not proper considerations on a motion for summary judgment."

*Chatman v. City of Johnstown, PA*, 131 F. App'x 18, 20 (3d Cir. 2005). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The parties do not contest the applicability of Pennsylvania law to this action, as all relevant events occurred within the Commonwealth.

## III. DISCUSSION

Defendants argue that summary judgment should be entered in their favor on liability because Gray was a trespasser and Plaintiff has failed to present any evidence of willful or wanton misconduct. (Docket No. 41 at 1). In support of this position, they aver that: (1) Engineer McIntosh did not breach the standard of care owed a trespasser; (2) Plaintiff's claims based on excessive speed or failure to control speed are preempted; (3) Defendants had no duty to fence or barricade the railroad right of way or to post warning signs; and (4) Plaintiff's request for punitive damages cannot be supported based on her allegations. The Court addresses each contention, in turn.

### a. Gray's Status and the Duty of Care Owed

The Pennsylvania Superior Court has held that "[g]enerally, the determination of whether an individual is an invitee, licensee, or trespasser is one of fact for the jury. Where the evidence is insufficient to support an issue, however, it may be appropriate for the court to remove that issue from the jury." *Palange v. Phila. Law Dept.*, 640 A.2d 1305, 1307 (Pa. Super. Ct. 1994). The Pennsylvania Railroad Civil Immunity Statute defines a "trespasser" as "[a] person who enters onto railroad property without any right, lawful authority or the express consent of the

railroad." 42 Pa.C.S.A. § 8339.1(c). Consistent with that definition, the Pennsylvania Supreme Court has cited and applied, though never officially adopted, the Second Restatement's definition, under which a trespasser is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329 (1965); *see also Rossino v. Kovacs*, 718 A.2d 755, 756-57 (Pa. 1998). Additionally, the Third Circuit, applying Pennsylvania common law, has held that "[m]ere acquiescence to trespassing does not alter an entrant's status," so that "a foreseeable trespasser is still a trespasser." *Estate of Zimmerman v. Se. Pa. Transp. Auth.,* 168 F.3d 680, 686 (3d Cir. 1999).

The Railroad Civil Immunity Statute provides the following relating to the duty of care owed to a trespasser:

> **(a) General rule.--**A railroad carrier owes no duty of care to keep its railroad property safe for entry or use by any trespasser who enters upon any railroad property or railroad right-of-way or to give any warning to such trespasser entering or going on that railroad property of a dangerous condition, use or activity thereon. Except as set forth in subsection (b), a railroad carrier shall not:
>> (1) Be presumed to extend any assurance to a trespasser entering or going on railroad property without the railroad carrier's consent that the railroad property is safe for any purpose.
>> (2) Incur any duty of care toward a trespasser entering or going on railroad property without the railroad carrier's consent.
>> (3) Become liable for any injury to a trespasser entering or going on railroad property without the railroad carrier's consent caused by an act or omission of such trespasser.
>
> **(b) Limitation.--**Nothing in this section limits in any way any liability which otherwise exists for willful or wanton failure to guard or warn against a dangerous condition, use or activity.

42 Pa.C.S.A. § 8339.1.[7]

---

[7] Plaintiff contends that this statute "deals with the level of care that a railroad owes to keep its property safe for

This statute affirms the well-settled principle that "[i]n Pennsylvania, a trespasser may recover for injuries sustained on land only if the possessor of land was guilty of wanton or willful negligence or misconduct." *Rosino,* 718 A.2d at 756 (Pa. 1998). The Pennsylvania Supreme Court has held that willful misconduct and wanton misconduct are two distinct concepts. *Evans v. Phila. Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). Willful misconduct is something akin to intentional conduct, where an "actor desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue. This, of course, would necessarily entail actual prior knowledge of the trespasser's peril." *Id.* In contrast, wanton misconduct is more akin to recklessness, and "'means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow'" and "'[i]t usually is accompanied by a conscious indifference to the consequences.'" *Id.* (quoting PROSSER, TORTS § 33 at 151 (2d ed. 1955)). Therefore, a party need not have actual prior knowledge of the danger in order to constitute wanton misconduct; rather, an actor will be liable if, from the facts known to him, he should have realized the imminent danger. *Evans,* 212 A.2d at 575 (quoting *Turek v. Pa. R.R. Co.,* 85 A.2d 845, 847 (Pa. 1952)).

Plaintiff cites *Franc v. Pa. R.R.*, to argue that the Defendant's duty of care was higher here than in a typical trespasser case because:

> A possessor of land who knows or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm caused to them

---

entry, not with the operation of its trains," apparently distinguishing between failure to maintain the actual property and the danger of an approaching train. (Docket No. 48 at 6). This argument is undercut both by Plaintiff's own statement that the statute codifies the common law—which inarguably dealt with the operation of trains—and by the language in the statute referring to a "dangerous condition, **use, or activity** thereon," which certainly includes train operations. (*Id.* at 5 n. 1; 42 Pa.C.S.A. § 8339.1 (emphasis added)).

> by an artificial condition, thereon, if
> (a) the condition:
>> (i) is one which the possessor has created or
>> (ii) is, to his knowledge, likely to cause death or serious bodily harm to such trespasser and
>> (iii) is of such a nature that he has reason to believe that such trespassers will not discover it[ and]
> (b) the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved therein.

225 A.2d 528, 529 (Pa. 1967) (citing RESTATEMENT OF TORTS, § 335).

Applying *Franc* would contradict the rule in *Zimmerman* that foreseeability does not subject railroad companies to a higher duty of care. 168 F.3d at 686. *Franc* is also factually distinguishable from the instant case because, rather than being struck by a train, the plaintiff in *Franc* fell through a defective bridge belonging to the railroad company. 225 A.2d at 528. Indeed, logically, it does not appear that the *Franc* test could ever apply to a case involving a train crash, because it would be impossible to say that a train on active tracks is "of such a nature that [the owner] has reason to believe that such trespassers will not discover it." *Id.* at 529. Rather, the test only seems to apply to cases, like *Franc*, where the harm was from a failure to maintain the actual property, as opposed to the operation of trains. 225 A.2d at 528. In fact, *Franc's* plurality opinion distinguishes the applicability of *Falchetti v. Pa. R.R. Co.*, 160 A. 859 (Pa. 1932) on the basis that the underlying factual scenario in *Franc* "has nothing to do with a railroad engine, a curve, or a collision." 225 A.2d at 529.

Defendants offer several other reasons for not relying upon *Franc* to place a higher duty upon them in this case. First, *Franc* is a plurality opinion and, therefore, is not binding precedent.[8] *Id.* Second, the plurality in *Franc* based its decision on the RESTATEMENT (SECOND)

---

[8] Plaintiff argued at the Hearing on Defendants' Motion that "to say [*Franc*] is a plurality opinion . . . is a reach," because "[i]t was a five to two decision in favor of the plaintiff in that case. The reason for the concurrence, as best as [Plaintiff's Counsel] can tell in the short statement by Justice Roberts was he did not agree with Justice Musmanno's reliance on the Restatement of Tort[s] Second." (Docket No. 56 at 19:10–16). However, "[w]hen a

OF TORTS § 335, which section has been explicitly rejected by Pennsylvania courts as well as the Third Circuit. *Howell v. CSX Corp.*, 1997 WL 44843 at *5 (E.D. Pa. 1997) (citing *Micromanolis v. Woods School Inc,* 989 F.2d 696, 700 (3d Cir. 1993) and *Graham v. Sky Haven Coal, Inc.*, 563 A.2d 891, 896–97 (Pa. Super. 1989)). Further, as noted, *Franc* is factually distinguishable, as it related to an injury suffered by falling through a poorly maintained bridge, not being hit by a train.

In addition to *Franc*, Plaintiff cites *Francis v. B&O R.R. Co.*, 93 A. 490 (Pa. 1915), for the proposition that "a minor trespassing pedestrian who followed a longitudinal path along a railroad track and was struck by a train was able to recover, when it could be shown that the railroad knew, or should have known, of the public's usage." (Docket No. 48 at p. 7). Defendants correctly point out two problems with Plaintiff's reliance on same. First, there is no evidence of record that Defendants knew, or should have known, of sufficient usage of the tracks by the public prior to the incident

Second, in several subsequent cases, the Pennsylvania Supreme Court has held that no such longitudinal permissive way exists. *See e.g., Davies v. Del. L & W R. Co.*, 87 A.2d 183 (Pa. 1952); *Conn v. Pa. R. Co.*, 136 A. 779 (Pa. 1927); *Gray v. Pa. R. Co.*, 141 A. 621 (Pa. 1928). Defendants specifically rely on *Gray*, which refused to find the existence of a longitudinal permissive way based on testimony that failed to define a specific area where the alleged permissive way existed. 141 A. at 622. Ultimately, even if Pennsylvania recognizes the existence of a longitudinal permissive way, the facts of record, viewed most favorably to

fragmented Court decides a case and no single *rationale* explaining the result enjoys the assent of [a majority], 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (emphasis added) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)(opinion of Stewart, Powell, and Stevens, JJ.)) As such, this Court reads the *Franc* Concurrence as limiting recovery to the *Franc* Plaintiff "under the singular facts of [her] case." 225 A.2d at 532 (Roberts, Eagen, JJ., concurring). As Ms. Manfred's case is clearly factually distinguishable from the *Franc* case in numerous ways–most importantly that *Franc* did not involve a train crash–the Court views it as distinguishable.

Plaintiff, are legally insufficient to support a finding that one existed at the scene of the accident, as there is no evidence defining the specific area of the alleged permissive way or that Defendants had notice of same prior to the accident.

Accordingly, the Court finds that, based upon the facts of record, no reasonable juror could conclude anything but that Gray was a trespasser as a matter of law. Under the Third Circuit's holding in *Zimmerman,* even if it were foreseeable that Gray or others could be on the track because the area was allegedly commonly used for jogging, (Docket No. 1 at ¶¶ 17–18, 22), this foreseeability does not alter his status as a trespasser where he "enter[ed] or remain[ed] upon [Defendants'] land without a privilege to do so created by possessor's consent or otherwise." *Zimmerman,* 168 F.3d 680, 686; *Rossino,* 718 A.2d 755, 756–57. Further, even if Pennsylvania were to recognize a longitudinal permissive way, the facts of record could not support a finding that one existed here. Therefore, Defendants only owed Gray a duty to refrain from willful or wanton misconduct. 42 Pa. C.S.A. § 8339.1; *Rosino,* 718 A.2d at 756.

    b. <u>Breach of Duty</u>

Having established that Gray was a trespasser, the Court must determine whether Defendants' actions amounted to willful or wanton misconduct. 42 Pa. C.S.A. § 8339.1. Initially, as Plaintiff has not alleged any facts indicating that Defendants or their agent McIntosh intended that the accident occur or were substantially certain it would ensue, Defendants cannot be liable for willful misconduct as a matter of law. *See Evans*, 212 A.2d at 443.

The Pennsylvania Supreme Court has held that a defendant will be liable for wanton misconduct where he does not take reasonable care to avoid an accident from the moment he realizes that a party is in a position of peril, and that the mere fact that the defendant failed to prevent the accident does not mean that the defendant failed to use reasonable care. *Moss v.*

*Reading Co.*, 212 A.2d 226 (Pa. 1965). Generally, the question of whether the defendant acted with reasonable care to avoid an accident would be a question of fact for the jury. *E.g.*, *Sturdevant v. Erie,* 458 F.2d 1214 (3d Cir. 1972); *Goss v. Baltimore,* 355 F.2d 649 (3d Cir. 1966); *Francis v. B&O R.R.*, 247 Pa. 425 (1918). However, both state and federal courts have, at times, decided the issue as a matter of law. *E.g., Barr v. Consolidated Rail Corp.,* 1999 WL 554598 (E.D. Pa. 1999) (granting Defendant railroad's Motion for Summary Judgment); *Cage v. New York Cent. R.R. Co.,* 276 F.Supp. 778, 791 (granting Defendant's motion for J.N.O.V.); *cf. Moss*, 212 A.2d at 229 (affirming nonsuit entered after the close of Plaintiff's case in a bench trial).

In *Moss*, the defendant engineer first saw the victim 1,500 feet away, across the roadbed, with two sets of railroad tracks between decedent and that of the moving train. 212 A.2d at 227. The engineer began to blow the train's whistle when the victim began to cross the first set of tracks, but the engineer did not deploy the emergency brake because he believed that the victim would stop on the center track to let the train pass. *Id.* at 228. The engineer deployed the emergency brake when the victim stepped off of the center track towards the track on which the train was travelling, but failed to stop the train in time to avoid the collision. *Id.* The Court held that the engineer did not have a duty to deploy the emergency brake when the victim failed to respond to the train whistle because the engineer "had every right to believe that a man, walking diagonally across the tracks toward an oncoming train with its headlight full beam and emitting warning whistle blasts, would stop at the center track, letting the train pass, rather than walk directly into its line of travel." *Id.* The Court found as a matter of law that the defendant had not acted willfully and wantonly because he had no duty to deploy the brake until he knew the victim was in a position of peril—that is when he stepped off the center track towards the track on

which the train was. *Id.*

The holding in *Moss* sanctions McIntosh's belief that Gray would respond to the train's whistle, and provides no duty to deploy the train's emergency brake until he realized that Gray was in a position of imminent peril—when he realized Gray was not responding to the train's whistle. 212 A.2d at 228. Hence, if McIntosh deployed the brake when he realized that Gray was not moving from the tracks, Defendants did not act wantonly as a matter of law. (Docket No. 40 at ¶ 15).

Plaintiff's main argument is that, according to its expert report,[9] McIntosh should have been able to identify that a person was on the tracks from a distance of 1,757 feet, which would provide sufficient time for the train to come to a complete stop before the point of impact. (Docket No. 45-2 at 19). However, there is no evidence on record that a reasonable engineer would have behaved any differently than McIntosh did under similar circumstances.[10] In fact, in his deposition, McIntosh testified that, when there is a person on the tracks in front of the train, "[t]he first order of defense is to sound the horn and warn whoever or whatever is on or about the tracks that [a train is] coming."[11] (McIntosh Dep. at 14:8–10). McIntosh went on to testify that:

---

[9] Plaintiff's expert report was prepared by Carl Conti. Mr. Conti has a B.S. in Electrical Engineering/Communications and Signal Processing from Pennsylvania State University. (Docket No. 45-2 at 28.). In addition, he has taken several graduate level courses in Electrical Engineering. (*Id.*). He has several decades of industry experience in the research and development of electrical systems for use in various applications, including the transit industry. (*Id.* at 27–28). Since 2009, he has also been the President and CEO of SIL4 Systems, Inc., which provides, *inter alia*, safety consulting to transit systems. (*Id.* at 27); *see also* SIL4 SYSTEMS, INC., http://www.sil4systems.com (last visited May 4, 2015). He has no experience as a locomotive engineer.

[10] To that end, McIntosh testified that, "[y]ou cannot put brakes on anytime you see somebody in the gauge of the track until you first attempt to extricate them. Once you place the train in emergency, now you are committed and there can be consequences, adverse consequences from placing a train in emergency. This is only done in an emergency." (Docket No. 45-5 at 63:15–21). "Once you place the train in emergency, the braking force that you apply cannot be modulated, reduced, or removed until the train stops so that the brake application will be very abrupt, it will cause some rough handling of the train, and it will cause a very hard stonewall stop." (*Id.* at 66:4–9). In fact, throughout his career, McIntosh had only applied emergency braking on one other occasion within Allegheny County. (Docket No. 45-5 at 84:3–13).

[11] Richard W. Makosky testified similarly, indicating that, while he has had a number of "close calls," he has never had to apply the emergency brake, as blowing the horn was sufficient to remove the trespasser from the tracks. (Docket No. 45-6 at 13:7–14:22). Makosky was a licensed locomotive engineer, and currently works for AMTRAK as the road foreman of engines in Pittsburgh. (*Id.* at 6:15–9:17).

> It took a second, maybe two, not more, to identify what I saw, the light not being very bright, it was at or a few minutes probably before sunrise, to identify the fact that that was a person walking in the gauge of the track. They were wearing something that appeared to be of an orange color. As soon as I identified that it was a person walking in the tracks, I blew the horn at them.
>
> Under normal – and this is a thing you see on a fairly regular basis. Under normal circumstances there's an almost immediate physical reaction from the subject because of the volume and – and noise that the horn makes. In this case it was quite clear in a very few seconds that the normal course of response was not happening in this case; therefore, I placed the train in emergency and I continued to blow at the subject until the accident occurred.

(*Id.* at 39:6–24). McIntosh's decision to start braking only after he perceived no reaction from the horn is supported by case law. *See Moss*, 212 A.2d at 228–29 (finding it reasonable for an engineer to wait to apply the train's emergency brake until after it was clear the victim did not heed the warning whistle).

Plaintiff claims that, based on the expert report, had McIntosh activated the emergency brake two seconds before he sounded the horn—within range of when the report contends Gray should have been visible—the impact could have been avoided. (Docket No. 44 at ¶ 41). Plaintiff further claims that if he had activated the brake when he sounded the horn the impact would have been survivable. (*Id.*). Initially, Conti admitted that this second position is "total speculation." (Docket No. 45-8 at 213:6–25). Further, as noted, Pennsylvania law does not countenance either of these views, requiring a locomotive engineer in such a situation to apply brakes only after it becomes apparent that a potential victim is not responding to the train's horn.[12] *See, e.g.*, *Moss*, 212 A.2d at 228–29.

Additionally, according to Plaintiff, if McIntosh had applied non-emergency braking when he allegedly first could have observed something on the tracks, there would have been time

---

[12] Clearly, this analysis would be different if, all else remaining the same, McIntosh *never* sounded the horn or activated the emergency brake, but that is not the case in front of the Court.

to observe Gray, blow the horn, and ultimately apply emergency braking. (Docket No. 44 at ¶ 42). However, in view of the case law, McIntosh simply did not have a duty to apply braking of any kind until after he determined that Gray was not vacating the tracks based on the sounding of the train's horn. *See, e.g.*, *Moss*, 212 A.2d at 228–29.

As noted, Plaintiff's expert report indicates that McIntosh should have been able to see an individual on the tracks from approximately 1,757 feet (about 1/3 of a mile) from the point of impact. (Docket No. 44 at ¶ 8; Docket No. 45-2 at 18). This would mean that McIntosh theoretically could have seen Gray 21 seconds before impact, which was approximately 13 seconds before he sounded the horn. (Docket No. 44 at ¶ 8). In his deposition, McIntosh testified that he first saw Gray when he was "near" the "A Station" on the East Busway, which is—consistent with the expert report—approximately 1,757 feet from the accident site; however, he does not define "near." (*Id.*; Docket No. 45-5 at 90:21–91:10).

McIntosh's unequivocal testimony is that he saw "something on the tracks." (Docket No. 45-5 at 39:8). "It took a second, maybe two, not more, to identify what [he] saw." (*Id.* at 39:8–9). "As soon as [he] identified that it was a person walking in the tracks, [he] blew the horn at them." (*Id.* at 39:13–15). "[I]t was very clear in a very few seconds that the normal response was not happening in this case." (*Id.* at 39:20–22). Accordingly, he "placed the train in emergency and [he] continued to blow [the train's horn] at the subject until the accident occurred." (*Id.* at 39:20–24). Much of that course of events is corroborated by the factual record before the Court, including the data table from the event recorder. (*See* Docket No. 40-1 at 48–54).

McIntosh saw Gray on the tracks. (Docket No. 45-5 at 39:8–9). He sounded the train's horn. (*Id.* 45-5 at 39:13–15). When Gray did not respond, McIntosh engaged the train's

emergency brake. (*Id.* at 39:20–24). While the outcome of this accident was, undoubtedly, tragic, based on the controlling case law, it is clear that this is simply not willful or wanton behavior in breach of a duty imposed by Pennsylvania law. *See, e.g.*, *Moss*, 212 A.2d at 228–29. Accordingly, as a matter of law, Defendants are not liable for failing to slow or stop the train, based on the record before the Court.

### c. Excessive Speed

The Supreme Court of the United States has held that federal law preempts state common law actions based on excessive train speed. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 674 (1993). The Court further held that compliance with the Federal Railroad Administration's speed limit, codified at 49 C.F.R. § 213.9(a), precludes the imposition of liability under a state law claim for excessive speed under the circumstances and conditions existing along a particular class of track. *Id.*

The speed limit at issue in this case is 60 miles per hour for a passenger train on a class 3 track, and there is no evidence that Defendant's train ever exceeded that limit.[13] 49 C.F.R. § 213.9(a); (Docket No. 40 at ¶ 31). Further, the data table from the event recorder corroborates that the train never exceeded 60 miles per hour. (Docket No. 40-1 at 48–54). Thus, as a matter of law, Defendants cannot be held liable under Plaintiff's excessive speed theory in this incident. *See CSX Transp,. Inc.*, 507 U.S. at 674.

### d. Duty to Fence/Barricade

The Pennsylvania Supreme Court has held that a railroad has no duty to fence off its right of way. *Malishewski v. Pa. R.R. Co.,* 52 A.2d 215 (Pa. 1947). The Pennsylvania Superior Court

---

[13] Plaintiff notes that "the speed limit from the Pittsburgh Amtrak station until mile marker 352.1 is 30 mph. The speed limit only increases to 60 approximately 8 miles before the point of the accident, and then is reduced from 60 at mile post 345, 1mile past the incident." (Docket No. 44 at ¶ 29). Because there is no dispute that the speed limit at the section of track where the accident took place was 60 mph, and the train never exceeded 60 mph, the speed limit of other parts of the track is wholly irrelevant to the Court's analysis.

has further found that a company has no duty to "take precautions against any class of persons who may walk on and along their tracks." *Leithold v. Phila. & Reading Ry. Co.,* 47 Pa. Super. 137, 145-46 (1910). This rule is based partially on a policy that "[t]he danger of entry on such tracks of defendant was obvious." *Noonan v. Pennsylvania R.R. Co.,* 194 A. 212, 215 (Pa. Super. 1937); *see also Laurie v. Nat'l R.R. Passenger Corp.*, 105 Fed.Appx. 387, 390–91 (3d Cir. 2004).

Plaintiff argues that *Leithold* only holds that the railroad does not need to "erect impassable barriers along *every foot of its right of way*," and therefore does not apply here because Plaintiff is not arguing the company had a duty to fence its *entire* right of way. (Docket No. 48 at 10; 47 Pa. Super. at 144 (emphasis added)). Instead, Plaintiff asks that the Court apply *Franc v. Pa. R.R. Co.*, and hold that the railroad had a duty to eliminate the peril of which it has actual knowledge. 225 A.2d at 529. This argument fails because of the reasoning enunciated in *Noonan*, which is the same as why *Franc* does not apply to McIntosh's failure to slow or stop the train. Where the "dangerous condition" is the possibility of a train on active railroad tracks, that danger is too obvious to say that it is "of such a nature that [the owner] has reason to believe that such trespassers will not discover it." *Franc*, 225 A.2d at 529. Further, while *Franc* is a plurality opinion, the Pennsylvania Supreme Court has subsequently stated that "it long has been held that a railroad has no duty to erect fences on its right-of-way to deter trespassers," so its applicability as to this point remains sound. *Scarborough v. Lewis*, 565 A.2d 122, 126 (Pa. 1989).

Under *Malishewski* and *Scarborough*, Defendants had no duties to fence their rights of way, and under *Leithold*, *Noonan*, and *Scarborough* there was similarly no duty to erect warning signs where the danger of entering the railway was obvious. *Malischewski*, 52 A.2d 215;

*Scarborough*, 565 A.2d 122; *Leithold*, 47 Pa.Super. at 144; *Noonan*, 194 A. at 215. As such, Defendants cannot be held liable for failing to erect barricades or warning signs as a matter of law and Summary Judgment shall be granted in their favor as to this issue.

      e. <u>Punitive Damages</u>

Having determined that Defendants are not liable in this case, they clearly cannot be required to pay punitive damages. However, as Defendants raised the issue, the Court will summarily address it.

The Pennsylvania Supreme Court has held that punitive damages may not be awarded for negligence or gross negligence. *Phillips v. Cricket Lighters,* 883 A.2d 439, 445 (Pa. 2005). Rather, such damages are only appropriate where the Defendant has acted with "willful, wanton, or reckless conduct." *Hutchison v. Luddy,* 870 A.2d 766, 770 (Pa. 2005).

Because punitive damages are only allowable where the defendant has acted with willful, wanton, or reckless conduct, and the Court has held that Defendants did not so act in this case, punitive damages are precluded as a matter of law. *See id.*

## IV. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is granted. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: May 6, 2015
cc/ecf: All counsel of record